**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**SHANNON JACKSON,**
**TRENDAL PRICE, and**
**BTL ENTERTAINMENT,**

**Plaintiffs,**

**v.** **No. CIV-15-951 MV/SMV**

**CURRY COUNTY, CURRY COUNTY**
**MANAGER, LANCE A. PYLE,**
**CURRY COUNTY SHERIFF MURRAY,**
**COMCAST SPORTS VENTURES,**
**dba COMCAST SPECTATOR,**
**GLOBAL SPECTRUM OF NEW MEXICO, LLC,**
**and GLOBAL SPECTRUM, L.P.,**

**Defendants.**

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Curry County Defendants' Motion for Summary Judgment Based Upon Qualified Immunity and Sovereign Immunity ("Summary Judgment Motion") [Doc. 45], Plaintiffs' Motion for Leave to Supplement Evidence in Opposition to the Curry County Defendants' Motion for Summary Judgment Based Upon Qualified Immunity and Sovereign Immunity ("Motion for Leave") [Doc. 58], and Curry County Defendants' Motion to Strike Rule 56(d) Declaration of Joseph P. Kennedy ("Motion to Strike") [Doc. 64]. The Court, having considered the motions, briefs, and relevant law, and being otherwise fully informed, finds that the Summary Judgment Motion is well-taken in part and will be granted in part and denied in part, the Motion for Leave is moot, and the Motion to Strike is moot.

## BACKGROUND

"The facts supported by evidence, [viewed] in the light most favorable to [Plaintiffs]" as the party opposing summary judgment, are as follows.[1] *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 662 (10th Cir. 2010). Curry County, a political subdivision of the State of New Mexico, owns the Curry County Fairgrounds (the "Fairgrounds"), which includes the Curry County Events Center (the "Events Center"), a multi-purpose sport and entertainment arena. Doc. 45 at ¶ 5. Pursuant to a management agreement (the "Management Agreement") executed on or about January 1, 2012, Curry County engaged Global Spectrum, L.P. to manage and operate the Fairgrounds, including the Events Center. *Id.* at ¶ 6. At all relevant times, Global Spectrum was the sole and exclusive operator of the Events Center. *Id.* at ¶ 7. Pursuant to the Management Agreement, Global Spectrum was responsible for booking events at the Events Center and managing, *inter alia*, security and crowd control. *Id.* at ¶ 8. For purposes of entering into contracts regarding the Fairgrounds and the Events Center, Global Spectrum acted as agent for Curry County, and was authorized to sign and enter into such contracts in Curry County's name, as an agent for Curry County. Doc. 45-3 at 20. At all relevant times, Kevin Jolley, who was an employee of Global Spectrum, served as the General Manager of the Events Center. Doc. 45 at ¶ 11.

On or about September 3, 2013, an agreement entitled "License Agreement; Curry County Events Center and Fairgrounds," was made "by and between Global Spectrum, L.P. ("Licensor"), on behalf of the Curry County Events Center . . . and BTL Entertainment

---

[1] Although the Court construes the facts in the light most favorable to Plaintiffs, the Court will not consider those statements offered by Plaintiffs that amount to no more than characterizations or editorializing of the facts presented in the Curry County Defendants' Motion and conclusions that they seek the Court to draw from the facts.

("Licensee")," pursuant to which BTL Entertainment, in exchange for a fee of $4,000, obtained a license to put on a concert at the Events Center on October 25, 2013. Doc. 45-4. BTL Entertainment is a partnership between Plaintiffs Shannon Jackson and Trendal Price. Doc 45. at ¶ 1. The License Agreement states that Curry County "owns" the Event Center "and has engaged [Global Spectrum] to manage and operate the Event Center" on Curry County's behalf, and that Global Spectrum "is authorized to enter into contracts on behalf of [Curry County] for use of space within the Event Center." Doc. 45-4. The License Agreement was executed by Trendal Price for BTL Entertainment and by Jolley, as General Manager of the Events Center, for Global Spectrum. *Id.*

At approximately 3:30 p.m. on October 24, 2013, the day before the scheduled concert, Stephen Doerr, attorney for Curry County, sent an email message to Jolley, copied to Lance Pyle, the County Manager for Curry County, regarding "Concert Tomorrow Night." Doc. 45-5. The email message states as follows:

> It has just been brought to my attention that Global Spectrum has booked and signed a contract to lease the Curry County Events Center to Shannon Jackson and Trudle Price *[sic.]* where alcohol will be served. I have been advised by the sheriff's office that you have been notified that these two individuals have criminal records and both are presently on bond pertaining to a trafficking methamphetamine charge. As such, those two individuals cannot be involved in the sale or consumption of alcohol and cannot be on the premises where alcohol is being sold or consumed.
>
> I am advised that the sheriff's office has previously told you that the last time that one of these individuals held a rap concern *[sic.]* in Curry County, one of them ended up shooting somebody. I certainly do not believe that these are the types of events that the Board of County Commissioners of Curry County contacted *[sic.]* with Global Spectrum to hold at the Curry County Events Center.
>
> Global Spectrum, in addition to leasing the Events Center, has leased the Curry County liquor license. I am writing to notify you that with regard to tomorrow's concert, all laws pertaining to alcohol and alcohol consumption are to be strictly enforced by Global Spectrum. Global Spectrum and its agents and employees

> are to conduct themselves in such a manner as to not jeopardize or endanger Curry County's liquor license.
>
> It is my understanding that you have advised the Sheriff that based upon conversations with your legal representative and company representatives, that you do not believe that Global Spectrum is able to cancel the concert tomorrow night. Global Spectrum needs to make sure that proper law enforcement is available to handle the crowd for this event and that the promoter pays for any additional expenses that may be needed. At the present time, please be assured that Curry County will not waive any of its rights under contract with Global Spectrum and expects that Global Spectrum will comply with all those terms of its contracts, as well as New Mexico laws.
>
> Paragraph Number 3 on the general terms and conditions attached to your standard license agreement places the obligation on Global Spectrum to obtain and charge the licensee for all personnel, as may be required by Global Spectrum for security and others as otherwise needed. In addition, in Paragraph Number 12, it is your obligation to ensure that the licensee, and every person under its direction or contract, comply with all applicable laws with prior knowledge of the individuals who are putting on this concert, it is expected that Global Spectrum will ensure that those terms and conditions are fully complied with.

*Id.*

An hour later, at approximately 4:30 p.m. Rick Hontz, Regional Vice President of Global Spectrum, sent an email message to Doerr, Jolley, Pyle, and others, regarding "conference call to discuss hip hop show tomorrow night in Curry County." Doc. 45-6. In the email message, Hontz wrote, "I think it would be beneficial if we all got on a call tomorrow morning at 9 AM to discuss this event." *Id.*

Approximately 15 minutes later, Doerr sent an email message to Jolley, copied to Pyle, regarding "Friday's Event at Events Center." Doc. 45-5. In the email message, Doerr wrote that he had just received a call from Hontz, regarding the telephone conference for the following morning, and that, immediately after that call, he spoke with Matthey Murray, Sheriff of Curry County, and Deputy Reeves, who advised that they had obtained "the court order on the promoters [Jackson and Price] and informed [him] that the judge did not restrict either of the

individuals from being on the premises where alcohol is served or consumed. These individuals' conditions of release only state that they themselves cannot consume alcohol." *Id.* Doerr further wrote: "Would you please forward this to Rick [Hontz] and let him know that his concerns about the promoter not being allowed on the premises as a basis for cancelling the concert are not correct and I apologize for the same. I still think it would probably be in our best interest if we had a telephone conference call to discuss these matters." *Id.*

The next morning, October 25, 2013, at 9:00 a.m., a conference call was held among Jolley, other representatives from Global Spectrum, Pyle, Murray, Reeves, and Doerr. Doc. 45 at ¶ 27. The call focused on security for the concert that night. *Id.* at ¶ 28. In particular, Murray indicated that the Sheriff's Department would be providing law enforcement officers for the event, and Jolley advised that he had hired 30 people to staff the event, including 15 security guards and three staff to "watch the bars," and that the security staff would be equipped with metal detecting wands to screen patrons entering the building. *Id.* at ¶¶ 30-32. Later that morning, Murray confirmed that he would have his canine officer at the event with a drug sniffing dog, as well as signs advising the concertgoers of the presence of the dog. Doc. 45 at ¶ 35.

At the conclusion of the morning conference call, Pyle "believed that all security concerns had been adequately addressed, and the concert was to be held as scheduled that evening," Doc. 45-1 at ¶ 16, and Murray believed that the security measures planned "would be adequate to cover this concert and provide safety for the patrons," and that "everyone was in agreement that the concert was proceeding as scheduled." Doc. 45-2 at ¶¶ 10-11. Nonetheless, "[a]t the conclusion of the call, the Curry County representatives expressed their

continued concerns regarding the ability to ensure safety for the public and property at the concert scheduled for that evening." Doc. 51-1 at ¶ 6.

Global Spectrums' employees, including Hontz, "made the decision to cancel the concert based on the concerns expressed by the County representatives about the inability to ensure safety for the public and property at the event." Doc. 51-1 at ¶ 7. An undated memo on Curry County Events Center letterhead addressed to BTL Entertainment, signed by Jolley as General Manager of the Events Center, states: "The Southwest Jump Off Concert you had scheduled for Friday October 25, 2013 has been canceled. The cancellation of the show is due to Safety Concerns. We will return your deposit within 3 business days." Doc. 45-7.

Hontz advised Pyle via telephone call on the afternoon of October 25, 2013, that Global Spectrum had decided to cancel the concert. Doc. 45 at ¶ 36. Pyle then advised Murray at 1:30 p.m. that same afternoon that Global Spectrum had cancelled the concert. Doc. 45 at ¶ 35.

Based on the cancellation of the concert, Plaintiffs Jackson, Price, and BTL Entertainment commenced the instant action, filing their Complaint to Recover Damages for Deprivation of Civil Rights. Doc. 1. Counts I through III of the Complaint assert violations of Plaintiff's federal constitutional rights by Pyle, Murray, and Global Spectrum, along with the companies that own Global Spectrum (Comcast Spectacor, and Global Spectrum of New Mexico, L.L.C.) (the "Global Spectrum Defendants"). *Id.*[2] Counts IV through VI assert New Mexico state law causes of action against all Defendants, namely, Curry County, Pyle, Murray, and the Global Spectrum Defendants. *Id.*

---

[2] Plaintiffs appear to have intentionally excluded Curry County from the list of Defendants against whom they allege their constitutional claims. The paragraphs contained within the counts alleging constitutional violations, however, includes allegations that, if proven, would amount to municipal liability on behalf of Curry County. For this reason, the Curry County Defendants construe the Complaint as alleging municipal liability claims against Curry County.

Defendants Curry County, Pyle, and Murray ("Curry County Defendants") filed the instant Summary Judgment Motion, seeking dismissal of all counts of the Complaint as against them. Doc. 45. Plaintiffs filed a response to the Motion, in which they argue that dismissal of their constitutional claims as against Curry County Defendants is not warranted but concede that Curry County Defendants cannot be held liable for any of the state law causes of action alleged in Counts IV, V, and VI. Doc. 52. Accordingly, Plaintiffs do not object to dismissal of those claims as to Curry County, Pyle, and Murray. The Court thus is left to determine whether Counts I through III of the Complaint remain viable as to Curry County Defendants.[3]

## LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the initial burden of establishing that there is an absence of evidence to support the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant meets this burden, the non-movant must come forward with specific facts, supported by admissible evidence, that demonstrate the existence of a genuine dispute. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1526 n. 11 (10th Cir. 1992).

For purposes of Rule 56(a), a dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013). "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Id.* (citation omitted). In other words, "[t]he

[3] The Global Spectrum Defendants filed a response to the Summary Judgment Motion "solely to clarify and respond to certain facts set forth in the Curry County Defendants' Undisputed Material Facts." Doc. 51. In deciding the instant motion, the Court has considered the evidence presented by the Global Spectrum Defendants.

question . . . is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* (citation omitted). On summary judgment, the court "construe[s] the factual record and the reasonable inferences therefrom in the light most favorable to the nonmoving party." *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005).

**DISCUSSION**

Curry County Defendants frame their Motion as one seeking summary judgment on the basis of qualified immunity, which protects government officials performing discretionary functions "when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011). Despite this framing, Curry County Defendants' primary argument is that the undisputed evidence demonstrates that there was no state action involved in the cancellation of the concert, and that Plaintiffs' constitutional claims, brought pursuant to 42 U.S.C. Section 1983, thus fail as a matter of law – an argument separate and apart from that of qualified immunity. Curry County Defendants' secondary argument – that Pyle and Murray did not violate any of Plaintiffs' clearly established constitutional rights, and that, consequently, neither Pyle nor Murray, nor Curry County itself, is subject to liability on Plaintiffs' constitutional claims – rests entirely on the premise that there was no state action involved in the cancellation of the concert. As set forth herein, the Court cannot agree that the undisputed evidence demonstrates that there was no state action involved in the cancellation of the concert. Because Curry County Defendants' entire Motion rests on this premise, their Motion must be denied.

I. State Action

A. Standard

In order to prevail on a constitutional claim brought pursuant to Section 1983, "it is beyond cavil" that the challenged conduct must constitute "activity by a state." *Johnson v. Rodrigues*, 293 F.3d 1196, 1201 (10th Cir. 2002). There is an "essential dichotomy between governmental action, which is subject to scrutiny under the [Constitution], and private conduct, which, however discriminatory or wrongful, is not subject to the [Constitution]'s prohibitions." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1446 (10th Cir. 1995) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349 (1974)). Similarly, under Section 1983, "liability attaches only to conduct occurring 'under color of law.'" *Gallagher*, 49 F.3d at 1447. Accordingly, "[t]he only proper defendants in a Section 1983 claim are those who 'represent the state in some capacity, whether they act in accordance with their authority or misuse it.'" *Id.* (quoting *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988)).

"In the typical case raising a state-action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action." *Id.* at 192. The Court "ask[s] whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor." *Id.* "[S]tate action may be found if, though only if, there is a such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may fairly be treated as that of the State itself.'" *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).

The Supreme Court has taken "a flexible approach" to the state action doctrine, applying four tests to the facts of each case to determine whether action by private parties may be

attributable to the state: the nexus test, the symbiotic relationship test, the joint action test, and the public function test. *Johnson*, 293 F.3d at 1202; *Gallagher*, 49 F.3d at 1447. "Under each of these four tests, 'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'" *Gallagher*, 49 F.3d at 1447 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). "In order to establish state action, a plaintiff must demonstrate that the alleged deprivation of constitutional rights was caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Gallagher*, 49 F.3d at 1447 (quoting *Lugar*, 457 U.S. at 937). Additionally, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Gallagher*, 49 F.3d at 1447 (quoting *Lugar*, 457 U.S. at 937).

B. <u>The Instant Case</u>

The instant case is a "typical" one "raising a state action issue": Global Spectrum, a private party, took "the decisive step" of cancelling the concert, and "the question is whether [Curry County] was sufficiently involved to treat that decisive conduct as state action." *Tarkanian*, 488 U.S. at 192. In opposing the Summary Judgment Motion, Plaintiffs argue that, under both the nexus test and the symbiotic relationship test, Curry County was sufficiently involved to treat Global Spectrum's decision to cancel the concert as state action. In their Reply, Curry County Defendants disagree, contending that under the Tenth Circuit's decision in *Gallagher*, which they describe as "analogous" to the instant case, state action cannot be established under any of the four tests. As set forth herein, the Court finds that, under the analysis set forth in *Gallagher* of the nexus test, there is sufficient evidence of state action to overcome Curry County Defendants' Summary Judgment Motion.

In *Gallagher*, the Tenth Circuit explained that "[u]nder the nexus test, a plaintiff must

demonstrate that 'there is a sufficiently close nexus' between the government and the challenged conduct such that the conduct 'may be fairly treated as that of the State itself.'" 49 F.3d at 1448 (quoting *Jackson*, 419 U.S. at 351). Specifically, under the nexus test, "a state normally can be held responsible for a private decision 'only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" *Gallagher*, 49 F.3d at 1448 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). This test thus "insures that the state will be held liable for constitutional violations only if it is responsible for the specific conduct of which the plaintiff complains." *Gallagher*, 49 F.3d at 1448 (quoting *Blum*, 457 U.S. at 1004).

The "required inquiry" under the nexus test "is fact-specific." *Gallagher*, 49 F.3d at 1448. The following "important general principles," however, apply: (1) "the existence of governmental regulations, standing alone, does not provide the required nexus"; (2) "the fact that a private entity contracts with the government or receives governmental funds or other kinds of governmental assistance does not automatically transform the conduct of that entity into state action"; and (2) "mere approval or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the [Constitution]." *Id.* (citations omitted).

In *Gallagher*, the Tenth Circuit applied, *inter alia*, the nexus test to the following facts before it. United Concerts promoted a concert on March 20, 1991, at which Neil Young performed on the University of Utah (the "University") campus in Salt Lake City, Utah. *Id.* at 1445. United Concerts leased the Huntsman Center from the University for the concert. *Id.* Pursuant to a decision made by United Concerts personnel, and not by University Officials, United Concerts hired Contemporary Services to provide certain security services for the

concert. *Id.* The lease between the University and United Concerts reflected United Concerts' decision to hire Contemporary Services for security at the concert. *Id.* Contemporary Services had a policy that, for rock concerts, they would "always conduct a full pat down search," unless specifically directed to do otherwise by the firm that hired it. *Id.* Representatives of the University, including the director of the Huntsman Center, United Concerts, and Contemporary Services met twice to discuss arrangements for the concert, once two weeks before the concert and again two hours before the concert. *Id.* During the first meeting, United Concerts representatives directed Contemporary Services personnel to perform the pat-down searches in accordance with Contemporary Services' standard rock concert policy. *Id.* During the second meeting, United Concerts representatives, Contemporary Services personnel, and University officials discussed the procedures that would be used for the pat-down searches. *Id.*

On March 20, 1991, outside the Huntsman Center, Contemporary Services employees performed pat-down searches of individuals attending the concert. *Id.* at 1445-46. Uniformed officers from the University's Department of Public Safety were also present and were able to observe the pat-down searches. *Id.* at 1446. Thereafter, a group of individuals who attended the concert and were subjected to pat-down searches filed an action alleging that the searches violated the Fourth Amendment, naming as defendants the director of the Huntsman Center, United Concerts, and Contemporary Services. *Id.* The district court granted summary judgment in favor of the defendants, reasoning that the pat-down searches did not constitute state action and were not performed under color of law. *Id.* The plaintiffs appealed, arguing that under, *inter alia*, the nexus test, the facts sufficiently established state action. *Id.*

On appeal, the Tenth Circuit considered, and rejected, the plaintiff-appellants' argument

that three factors established a sufficiently close nexus between University rules, policies, decisions, and actions and the pat-down searches to warrant a finding of state action. *Id.* at 1449. First, the plaintiffs identified provisions from the Huntsman Center's operations manual that stated that officers from the University's Department of Public Safety "shall provide security" at Huntsman Center events, and to provisions from the University's job description for the director of the Huntsman Center that the director was ultimately responsible for final decisions regarding the number of support personnel, including security officers, at Huntsman Center Events. *Id.* The Court found that "these University rules and policies, standing alone, are simply too general to supply the required nexus to the pat-down searches." *Id.* at 1450. The Court explained that such "general language conferring broad responsibility on the government entity," is not dispositive, as the proper focus of the analysis must be "on whether the particular conduct at issue resulted from a government policy or decision." *Id.* In reaching this conclusion, the Court expressly stated: "To be sure, if the appellants could demonstrate that the pat-down searches directly resulted from the University's policies then the required nexus would be established. However, evidence of a such a specific causal connection is lacking." *Id.*

The Court noted that the uncontroverted evidence was that "the challenged searches were conducted pursuant to a policy formulated by Contemporary Services," and that there was no evidence "indicating that the University's rules and policies influenced the formulation or execution of this policy." *Id.* The Court further noted that there was nothing in the record to suggest that, if the concert had been held at a privately-owned facility at which the University's policies and procedures did not apply, "the pat-down searches would have been conducted any differently than they were at the Huntsman Center." *Id.* Accordingly, the Court concluded

"that the requisite nexus between the University's policies and procedures and the pat-down searches is absent." *Id.*

Next, the Court considered the plaintiffs' reliance on the fact that the director of the Huntsman Center was aware of the decision to perform pat-down searches. While noting that the record demonstrated that "sometime prior to the concert [the director] learned that Contemporary Services would conduct the pat-down searches," the Court explained that "it is well established that a state official's mere approval of or acquiescence to the conduct of a private party is insufficient to establish the nexus required for state action." *Id.*

Finally, the Court considered the plaintiffs' reliance on the fact that uniformed officers of the University Department of Public Safety observed the pat-down searches. The Court noted that "a number of courts have held that the mere presence of police officers does not transform the conduct of private parties into state action," and distinguished the case before it, where the University officers only observed the pat-down searches, from another case finding state action "where the employees of a government entity actually enforced the challenged rules." *Id.* at 1450-51. The Court concluded that, "because Contemporary Services employees conducted the pat-down searches pursuant to Contemporary Services policies, the observation of those searches by University officers does not supply the required nexus." *Id.* at 1451.

The evidence in the instant case establishes precisely the sort of "specific causal connection" between government "rules, policies, decisions, and actions" and "the particular conduct at issue" that the Court found lacking in *Gallagher.* Specifically, the day before the concert, Doerr, on behalf of Curry County, sent an email message to Jolley, General Manager of the Events Center and employee of Global Spectrum, expressly stating disapproval of the booking of the concert, and raising concerns about the ability to ensure safety at the concert.

Doerr noted that Jackson and Price had criminal records for drug trafficking, that one of them had held a rap concert in Curry County at which he shot somebody, and that concerts such as this were not "the types of events that the Board of County Commissioners of Curry County contacted *[sic.]* with Global Spectrum to hold at the Curry County Events Center." Doc. 45-5. The email specifically references the prospect of cancelling the concert and the consequences to Global Spectrum of not doing so, stating that Global Spectrum has advised that it is not "able to cancel the concert tomorrow night," and immediately thereafter stating that "Global Spectrum needs to make sure that proper law enforcement is available to handle the crowd for this event," and that "Curry County will not waive any of its rights under contract with Global Spectrum and expects that Global Spectrum will comply with all those terms of its contracts, as well as New Mexico laws." *Id.*

Although soon realizing that he had misinformation regarding the terms of conditions of release of Jackson and Price, and thus that cancellation of the concert was not necessary based on the particular concern that it would not be lawful for the promoters themselves to be present for the concert because alcohol would be served on the premises, Doerr nonetheless continued to press for a conference call to discuss the matters that he had raised in his original email message. Doc. 45-5. Accordingly, on the morning of October 25, 2013, a conference call was held among Curry County representatives and Global Spectrum employees. Doc. 45 at ¶ 27. The call focused on security for the concert that night. *Id.* at ¶ 28. While Pyle and Murray may have walked away from the call believing that the concert would proceed as planned, at the conclusion of the call, it is undisputed that "the Curry County representatives expressed their continued concerns regarding the ability to ensure safety for the public and property at the concert scheduled for that evening." Doc. 51-1 at ¶ 6. Within hours after the completion of

the call, Global Spectrum's employees "made the decision to cancel the concert based on the concerns expressed by the County representatives about the inability to ensure safety for the public and property at the event." Doc. 51-1 at ¶ 7. Thus, it was directly based on the expression of concern by Curry County representatives that Jolley, in his capacity as General Manager of the Events Center, wrote BTL Entertainment a memo, on Curry County Events Center letterhead, advising that their concert had been cancelled – due to the very safety concerns expressed by Curry County representatives. Doc. 45-7.

The undisputed evidence thus demonstrates that the cancellation of the concert "directly resulted" from the specific actions of Curry County representatives in repeatedly expressing disapproval and concerns regarding the concert. *Gallagher*, 49 F.3d at 1450. "To be sure," the evidence of a "specific causal connection" is sufficient to establish the nexus required to find state action. *Id*. Here, in contrast to *Gallagher*, the challenged decision was not made pursuant to a policy formulated by Global Spectrum, or any other private entity; rather, the evidence indicates that Curry County's own actions "influenced the formulation or execution of this [decision]." *Id.* And while the Court in *Gallagher* noted that there was nothing in the record to suggest that the pat-down searches would have been conducted any differently had they been held at a privately-owned facility, here the converse is true: there is nothing in the record to suggest that Global Spectrum would have decided to cancel the concert if the concert had been booked at a privately-owned facility at which Curry County's concerns had no applicability. In short, the evidence goes well beyond the existence of regulations, a contract, or approval or acquiescence, and instead demonstrates, as the nexus test requires, that Curry County "is responsible for the specific conduct of which [Plaintiffs] complain[]." *Id.* at 1448. Accordingly, Curry County can be held responsible for Global Spectrum's decision to cancel the

concert. *Id.*

II. Qualified Immunity

As noted above, Curry County Defendants move for summary judgment based on qualified immunity. Perhaps assuming that the Court would agree with their contention that Global Spectrum's decision to cancel the concert was not state action, in support of their motion, Curry County Defendants fail to address or brief the relevant issue, namely, whether the decision to cancel the concert violated Plaintiffs' constitutional rights, and whether the constitutional rights asserted by Plaintiffs were clearly established. *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001). At this juncture, Curry County Defendants have not provided a properly supported basis for the Court to grant summary judgment to Pyle or Murray based on qualified immunity or to Curry County based on the theory that municipal liability cannot be established. *See* D.N.M.L-R-Civ. 7.3.

III. Motion for Leave and Motion to Strike

Plaintiffs filed their Motion for Leave, requesting to supplement the record with certain videos and transcripts. The Court has reached its decision on the Summary Judgment Motion without reference to the videos and transcripts. The Motion for Leave thus is moot.

Curry County Defendants filed their Motion to Strike, requesting that the Court strike the Rule 56(d) Declaration of Joseph P. Kennedy. Because the Court has determined that summary judgment is not warranted on Plaintiffs' constitutional claims at this juncture, the Court need not reach Plaintiffs' alternative request for additional discovery pursuant to Rule 56(d). Accordingly, the Court need not consider Mr. Kennedy's Declaration, and Curry County Defendants' Motion to Strike thus is moot.

## CONCLUSION

There is a sufficiently close nexus between Curry County and Global Spectrum's decision to cancel the concert that the decision to cancel the concert may fairly be treated as state action. Because the decision to cancel the concert constitutes state action, the relevant issue is whether that decision violated Plaintiffs' clearly established constitutional rights. Curry County Defendants have not provided a properly supported motion for summary judgment addressing this issue. Accordingly, Curry County Defendants' request for summary judgment as to Counts I, II, and III must be denied. The parties agree, however, that Counts IV, V, and VI should be dismissed as to Curry County, Pyle, and Murray. For the reasons set forth above, Plaintiffs' Motion for Leave and Curry County Defendants' Motion to Strike are moot.

**IT IS THEREFORE ORDERED** that:

(1) Curry County Defendants' Motion for Summary Judgment Based Upon Qualified Immunity and Sovereign Immunity [Doc. 45]is GRANTED IN PART AND DENIED IN PART, as follows: Counts IV, V, and VI are dismissed as to Curry County, Pyle, and Murray, and Counts I, II and III remain viable as to all Defendants;

(2) Plaintiffs' Motion for Leave to Supplement Evidence in Opposition to the Curry County Defendants' Motion for Summary Judgment Based Upon Qualified Immunity and Sovereign Immunity [Doc. 58] is found as moot; and

(3) Curry County Defendants' Motion to Strike Rule 56(d) Declaration of Joseph P. Kennedy [Doc. 64] is found as moot.

DATED this 1st day of November, 2018.

MARTHA VAZQUEZ
United States District Judge